Good morning. We'll call for argument the matter of Edwards versus Wyatt. Mr. Zucker. Good morning, your honors. May it please the court, my name is Jeffrey Zucker and I represent the appellant and the cross-appellee Aaron Wesley Wyatt. I'd like to please reserve five minutes of my argument time for rebuttal. I hope to discuss this morning and to persuade the panel. I've got a lot of questions. Oh, okay. You know, one of the reasons we ask for oral argument is when we have questions about a case. Of course. You know, this is breach of contract. For breach of contract, you have three kinds of damages. Expectation damages, reliance damages, and restitution damages. Sounds like Clark Bice when I was a 1L. Expectation damages here, the contract was to confer together. The contract was that neither party would settle with this gentleman named Richard Phillips without the participation of the other. It was that simple. There's no writing. Yes, that was it. So, excuse me, that was the single term of the agreement? I'm sorry, there was a second term that if either party took an unreasonable position, then the contract would be off. So, expectation damages would be the difference between what was actually agreed on for the sale of Edwards assets and what that might, what that figure might have been had the parties cooperated on negotiating? That's a very difficult question to answer. And the reason is the agreement's been termed the handshake agreement by the court, so I'll call it the handshake agreement. That was the agreement that was made on April 30th, 1998. The agreement is internally inconsistent because if the parties, if there's a breach of the agreement, that means that the parties are battling over the stock and just as what happened in this case, the bidding went from 3.4 million to 3.6 million to 5 million plus a $3 million bond to 5.1 million to 5.2 million. On the other hand, if there was a respect for the contract and the contract was agreed to, I would assume that Mr. Wyatt and Mr. Edwards and Mr. Phelps would get together and say, okay, oh and by the way, Your Honor, this was a surplus Chapter 7. Everyone knew that. There would be something coming out the end. Exactly. So, the measure of damages would have to be expectation damages. Wouldn't it have to be the difference between what was actually the sale price and what the sale price might have been had there been cooperation? Yes, except that the assets weren't owned by Mr. Edwards. They were owned by the bankruptcy. I'm not talking, I mean, expectation damages would be the difference between what was actually received and what might have been received if the contract had not been breached. Correct. Now, one of the Yes. Yes. How can we know? And like the addicts case, maybe it may be that expectation damages are so speculative that we ought to turn to another form of damages. That's correct. And reliance damages, Mr. Edwards could say, well, my reliance was I didn't go find anyone else to buy the assets. But this was a private, this wasn't private, this was a 360 sale. Well, but still, you know, a public sale, you can go around and call friends and say, but he's not claiming that. That was his testimony. He said that he did not do that. Yeah. So, then we're left with restitution damage. Yes, Your Honor. And, you know, if you look at what what Judge Tucker did, in a way it sounds like restitution damage. It does. She had Mr. White disgorge what, a portion of what he received. Yes. So, it's really. But she had him disgorge what he already had, too, didn't she? Well, she made, she did a lot of things. I mean, she, in the disgorgement, she looked at 50% of the company. Yes. But he already owned 45% of the company. Correct. So, is that correct to make him disgorge stuff that he already had? Of course not. And, but there's an even more important point and, you know, we've been doing this since 1999. This case has been litigated since 1999. This is our third appeal and I'm finally getting it. I was just talking to my associate here and, you know, we wrote these briefs a year ago. And, you know, even now I look at it differently. If you look at the age. Well, please don't say that. No, but it's coming to greater focus for me and it's become much simpler. In A-TACS, I'm at the age where I have to, if we're talking about restitution damages. I wear trifocals and I don't have to do that anymore. Restitution damages will require the party in breach to disgorge the benefit received by returning it to the party who conferred it. The problem is that John Edwards didn't confer anything. Okay, and I'm reading from A-TACS at page 669 on the right hand side, right under, it's the first full paragraph, about halfway down. So, because I thought also, well, you know, what if the court asks me, what about restitution damages? And then I thought, but restitution means you have to give back something that somebody gave to you and Mr. Edwards didn't give anything. He voluntarily filed a bankruptcy and he understands, he had counsel, that when you file a bankruptcy, your assets become property of the bankruptcy estate. Now, he was a Chapter 7 debtor. It was a surplus estate, so he had some say in what went on. Mr. Braga was his counsel and there were, you know, he was permitted to do more than the usual, the typical Chapter 7 debtor. But he didn't give anything. When he filed his bankruptcy years before, his assets became property of someone else. That's the bankruptcy estate, not John Edwards. He gave them up in order for, in return for the protection of the bankruptcy code. Well, isn't that an argument not to make to us, but if we should decide that restitution damages should be the measure of damages, then I don't think we should take the next step and decide what those damages are. I think we ought to send it back. You know, the appellate courts take the position, never do anything you can make the district court do. Right. So, shouldn't that argument then be made to the district court? But I think that reversing and remanding or remanding for an evidentiary hearing as they did in ATAX is not going to work here. And if I could slowly go through a very fundamental damages analysis here, the three points that the plaintiff must show to be entitled to damages, I think we can see why. The law in the Third Circuit is relatively clear on damages. It's the plaintiff's burden. Damages are measured at the time of the breach. Okay? The breach was October, the time of the breach was October 30th, 1998. When the agreement was entered into without the participation of Edwards. Exactly. Announced to the bankruptcy court that morning. Okay? So that's our time. Now, just a footnote that Judge Tucker took bits and pieces of quote-unquote benefits Wyatt received in 2003, 2002, 2001 and gave them to Mr. Edwards. So, already there's a problem with being out of line with Third Circuit law. Okay? So, but we just go back to we measure damages at the time of the breach. In order for plaintiff to be entitled to damages, the damages must be such as would naturally result from the breach of the contract. Would these damages naturally result from the breach of this contract? I promise not to settle with Phillips without you and vice versa. How could Wyatt possibly know that years later he'd be in litigation with Mr. Phillips and years later some judge would fashion some remedy where Mr. Phillips in 2003 bought Mr. Wyatt out for $9.5 million? The answer is no, of course not. It doesn't fit. The second element is the damages must be reasonably foreseeable and within the contemplation of the parties at the time of the contract. So, here on April 30th, 1998, when these gentlemen made this handshake agreement, were these damages reasonably foreseeable and within the contemplation of the parties on April 30th, 1998? Okay? The answer is clearly no. How could – it's total speculation. And third – The amount of damages were foreseeable or the fact of damages were foreseeable? It's the fact of damages. The fact of damages. This is the only case like this. I can't find – ATAX was pretty close, but I can't find a case like this, and I've searched for many, many, many years. You know, I won't settle with A unless I include you and vice versa. It's – there's nothing like this for us to look at and say, well, what did other courts do, even in other circuits? There are no cases or states. There is not another case that I can find like this. But it sounds like you're arguing that the prolix nature of the happenings here should absolve your client of paying reasonable damages to the partner that he cut out of the deal in blatant disregard of the handshake agreement. But why should we reward that sort of breach? You are suggesting that a breach without a remedy can exist in this case. No. No, I'm not suggesting that at all because Mr. Edwards, at least where I grew up, you know, $5.2 million is not nothing. He, as a result of Mr. Wyatt's quote, unquote, breach, if we assume that just for purposes of this argument, I've got the repudiation, you know, the other arguments I've said might be, but if we're just looking at this damages and – Yeah, let's just look at the damages. Okay, focus on this. Because Mr. Wyatt breached and fought against the other bidder, the bidding, as a matter of fact, and it's in reported decisions and it's, you know, it's a matter of fact, it's undisputed, the bidding went from $3.4 to $3.6 to $5.1 to $5.2 million. It's a lot. Mr. Edwards didn't get nothing. He got $5.2 million. And by the nature of the bankruptcy and the fact that his stock had gone into the bankruptcy estate, Mr. Edwards would not have expected to get any of that stock back. That stock was going to be sold with the sale of the assets of the bankruptcy estate. Of course. So that Edwards has no claim to say, because of the breach of contract, I lost my stock in the company, because he had already put his company into the bankruptcy estate and he knew that that was going to be sold. Yes. And he expected, because it was a surplus, that he would get some money back. Yes. But he never expected that he would retain any control of the company. Correct. He made a decision. I mean, there are involuntary bankruptcies. This wasn't one of them. This was a voluntary bankruptcy, and he made a decision that in return for the protections of the code, he got to, I think, save his house. He's a father with children, and he had a house. He got to save his house, and whatever else happened in the bankruptcy, he gave up his assets. They went to the estate to be – it's a Chapter 7. The very definition of a Chapter 7 is liquidation. You liquidate the assets. You pay off the creditors. And here there was excess. The excess goes to the debtor. And the question is, would there have been more excess if the handshake agreement had not been breached? How can you ever know? Yeah, that's the question. That's the question. But you can't know. It's just too speculative. Okay. So if you say that's too speculative, then what is restitution? There cannot be restitution. There cannot be restitution because Mr. Edwards, as a matter of law, Mr. Edwards must have given something in order for it to be given back to him. But now you're going back to what Judge Smith said. You can't have expectation damages. You can't have restitutionary damages. But you're arguing that the complexity here leaves this non-breaching party without a remedy. But the non-breaching party had a great remedy. The poor non-breaching party got $5.2 million. What was the company worth in 1998? We don't know. There's no testimony in the record. I don't know. The last day Mr. Edwards was on the property of the company, on the premises of the company, was 1994. Has Edwards demonstrated that the company was worth more than $5.2 million? Well, that the assets of the bankrupt estate was worth more than $5.2 million. The market. The market dictated that because that's, I guess, the bidding went to that number, and then the two parties that were bidding against each other came to an agreement. So to prove expectation damages, would Edwards have to prove that the assets of the bankruptcy estate were worth more than the $5.2 million? I don't think that's relevant. I don't think he—respectfully, I don't think that's relevant because the assets are not his assets. They're someone else's assets. They don't belong to him anymore. He gave them away in consideration for— So he would have to go to the trustee in bankruptcy and say—or he would have to— He did. He did. He said, unfair, collusive bid. That's unfair. That's illegal what those two guys just did. And he filed a motion with—before Judge Sigmund, and Judge Sigmund in December 1998 issued an opinion that says, I don't agree. And by the way, the handshake agreement was never— So it's just race to cuticata? I think so. The handshake agreement was never mentioned in that motion. Then he appealed Judge Sigmund's decision and then withdrew the appeal with prejudice. Judge Sigmund— So— Go ahead, Tony. But isn't it true that if Edwards were standing in Wyatt's shoes, what was to prevent Edwards from yielding the same $12.9 million that Wyatt did? I mean, your client cut him out of the deal and ends up with $12.9 million. What about that deal would have precluded Edwards from doing the same had he been the breaching point? $12.9 million from the ultimate sale? Yeah. But you value it as of the time of the breach. And Edwards knew he would no longer have stock in the company, so the increase in the value of the company is irrelevant to Edwards because he no longer gave up his interest in the company. Is that a question for counsel or are we in conference? I need to know. What am I doing here? I'm sorry. Can you explain? I'm having trouble understanding why Edwards, had he been the breaching party, could not have yielded the same $12.9 million that Wyatt yielded. Edwards could not have been the breaching party. Edwards was a debtor in a Chapter 7 bankruptcy. He can't have a secret agreement with a bidder. No, no, if Edwards had cut Wyatt out of the deal. But he couldn't because he didn't own or control his asset. It was controlled by Christine Schubert, who was the Chapter 7 trustee. She was given that role to liquidate the estate. So the assets were owned by somebody else. He couldn't make a deal with anybody. It wasn't his stuff. It wasn't his stock, his real estate, whatever the assets were. He had certain claims, certain lawsuits, so the assets were a bundle of assets. But he gave them up when he filed his bankruptcy. Actually, he filed two bankruptcies. He filed the first that was, I think, dismissed, and then he filed the second one. And it's a Chapter 7. It's liquidation. It is what it is. He made a choice. He made a decision. All right, Mr. Zuckerberg. We'll have you back on rebuttal. Okay. Thank you very much. Thank you very much. Mr. Breyer.  Thank you, Your Honors. Let me start with Judge Hardiman's point about why couldn't Edwards have negotiated the same kind of deal and, therefore, generated the same $12.9 million benefit for himself? The answer is he could have. No, he couldn't because aren't damages determined at the time of the breach? Damages are determined at the time of the breach. Okay, and what was the company worth at the time of the breach? The evidence in the record shows that in July of 1998, shortly before the breach, Mr. Wyatt was willing to pay $10 million for Edwards' shares. And was that? Years later, he paid $9.5 million. So the fair inference, I think, is somewhere between those two points. And the expectation damages, then, that you would expect from the breach of the handshake agreement would be the difference between what was actually paid into the bankruptcy estate for the assets and what would have been paid if Edwards had been part of the negotiating team, right? That's correct. Right. But didn't Judge Sigmund, in approving the deal, prevent you from coming back later and saying it was a bad deal? Didn't Judge Sigmund, in approving the October 30th deal? Yeah. Yeah, certainly. Okay, so then how can you come – doesn't that prevent you from coming back now and saying that was a bad deal? It's a different deal. That deal was a good-faith sale under avid dairies in the bankruptcy court of certain assets. Right. The deals that we need to compare here to compare apples with apples, Judge Hardiman's question is, could Edwards have negotiated, in effect, the same deal that Wyatt did with the arch enemy, Mr. Phillips? That included as components not only the pilot stock that Judge Sigmund approved the sale of, but also all these other rights, employment contracts, other benefits. But as of the date of the breach? Did the employment contract exist as of the date of the breach? Yes. Okay. It was in the settlement agreement. Didn't Judge Sigmund approve all that? She did, but she didn't value it. Okay. She approved the deal. Yes. So how can you say there would have been a better deal if the bankruptcy court has approved the deal it was? Because the bankruptcy court is not going to approve a deal that does not get adequate value for the assets being sold. The fact that Judge Sigmund found adequate value in the context of the bankruptcy code does not answer the question whether Mr. Edwards, had he not stood faithfully by Mr. Wyatt and foreborn approaching Mr. Phillips, couldn't have negotiated a better deal. In fact, the record is clear. The only evidence in the record is that he could. Here's the evidence in the record on this point. It's in the joint appendix, page 401, Edwards' testimony. Question. Do you think you could have concluded your own deal with Mr. Phillips if you knew Mr. Wyatt was trying to do so? Answer. I am quite confident I could have, quite candidly. Mr. Phillips didn't like either Mr. Wyatt or myself, and it was just a question of dollars and cents for Mr. Phillips, and I'm sure that I could have made a deal that would have been conducive to Mr. Phillips. Question. Conducive because it would have been cheaper for him? Answer. Correct. All Phillips cared about, he didn't care about Wyatt or Edwards. He just cared about gaining control of the company for the least price possible, and if Edwards had approached Phillips for a dollar less than Wyatt, he would have gotten the same deal, $12.9 million minus $1. But you complained to the bankruptcy court that this deal is collusive and that it's not a good deal, it should have been more, and the bankruptcy court approved it. The bankruptcy court approved it as a sale under the bankruptcy code, not as a proper remedy for the handshake agreement. The handshake agreement was years after the bankruptcy was filed. It was a post-petition asset, different deal. The handshake was before the bankruptcy was filed? No. The handshake agreement was before the bankruptcy to – okay, I'm sorry, you're right, it was after the bankruptcy. Yes. But it was before the, for instance, $12.9 million evaluation of the assets. It was before the sale of the company by Mr. Wyatt for $9.5 million, correct? Correct. Yeah. So those figures are irrelevant to what the damages should be for the breach of contract. I don't think they are relevant, no, Your Honor. Okay. So expectation damages would be the difference between the deal that Phillips and Wyatt agreed on and what the deal would have been if Edwards had participated. Right. I think look at the whole bundle of rights, including the bankruptcy piece, which Judge Sigmund approved, and whatever other rights there might have been that should have flowed to Edwards. And where in the record do we find your position as to what that figure would be? It's throughout the record in terms of damages. If you're talking about the pro rata formula, the measure of what portion of those benefits should have been shared, I can give Your Honors a couple of those. No, I'm talking about what the deal would have been if the contract had not, if the handshake agreement had not been breached. Sure. What is the figure the deal would have been? Your Honor, we provided to the district court eight separate components of damages. What we did. What would the price for the assets have been if the handshake agreement had not been breached? There are two questions there, Your Honor. One is what the price for the assets would have been in the bankruptcy court, and then what else would Mr. Phillips have paid to make that sale happen? That's what he did with Mr. Wyatt. He got together with Mr. Wyatt to remove Wyatt's objection. He could have done the same thing with Edwards to remove Edwards' objection. Remember, because this was a surplus bankruptcy estate, Edwards had standing. Edwards had, in fact, the only remainder of the business. Okay, what would the deal have been if the handshake agreement had not been breached? If the handshake agreement had not been breached, Mr. Wyatt would have received, Mr. Wyatt and Mr. Edwards and their pool of benefits to be shared as a result of the settlement with Phillips would have received, according to the evidence we put on in the district court, approximately $32 million worth of benefits. Those include the interest in pilot, the legal fees payment. Okay. Well, Wyatt already had 45 percent interest in pilot. So that's not part of the damages. I believe it is part of the damages, Your Honor. It was under a cloud of title. It was in litigation. He didn't have the shares physically. They had never been registered on the Secretary's books at the corporation as him owning. It was civil RICO litigation in Camden, New Jersey, challenging his exercise of the options as fraudulent. Okay, where – you know, I'm reading the briefs, and I don't see where you say – my understanding was he had 45 percent of the company. Where does it say he had no interest in the company? If Your Honor looks at Plaintiff's Exhibit 24, that's the settlement agreement between Edwards and Wyatt that started their whole relationship. It recognizes that Pilot has not yet acknowledged Wyatt as the owner of the 45 shares of stock. If you look at Plaintiff's Exhibit 121, the ultimate settlement agreement between Phillips and Wyatt, it refers to the settlement of the Camden litigation. If you look at Joint Appendix 624, Wesley Wyatt testified, quote, I was in court trying to fight for my option to recover my 45 shares. If you look at Joint Appendix 336, Wesley Wyatt's attorney, Ira Silverstein, said, quote, there was never any guarantee, close quote, as to how the Camden case was going to turn out. Mr. Braga, getting back to the Bankruptcy Court for a minute, was the measure of damages for breach of the handshake agreement at issue before the Bankruptcy Court? No, the handshake agreement was not at issue before the Bankruptcy Court because it was a post-petition asset. Judge Kelly so found on an initial motion to dismiss that was the law of the case below. It was never before the Bankruptcy Court. Also, Your Honor, if you look at our red brief, the opening brief for Mr. Edwards, Judge Roth, at page 49, it talks about the dispute over Mr. Wyatt's ownership of the 45 shares. And did Judge Tucker then determine that he did not own them so that his 45 percent should not be recognized in determining what he received? She did not make that determination. By the time Judge Tucker ruled on the case, Mr. Wyatt had recovered the shares by virtue of the settlement agreement that we're fighting about here with Mr. Phillips, Plaintiffs' Exhibit 121.  She made a determination where when the handshake agreement was entered into, Wyatt had a big fight about whether he owned 45 shares at all. And at the after the breach, he had clear title to his 45 and five extra. And how do I value that clear title versus disputed title? That's what she had before her. Well, reading her opinion, I don't see that anywhere in her opinion. It's not a specific finding of fact about that. She does talk about the fact that she values as a benefit that Wyatt received was 50 percent interest in Pilot. And as I said, the evidence before her established the fact that there was this litigation in Camden, New Jersey, that Wyatt's title was under a cloud. But in her finding of fact, she doesn't say anything about that litigation, does she? She does not, no. Well, then how can, you know, I find your position difficult to find in the opinion that we're reviewing. In terms of how she valued the 45 shares for damages purposes? Yeah. It's not clear. Your Honor, let me turn to damages. Your Honor is focused on damages with Mr. Zucker, and I think this is actually a very interesting damages case. It's not a tax. There is an expectation damages theory here if you agree that a pro rata formula is the way that Wyatt and Edwards should have shared the benefits under the handshake agreement. Well, the expectation damages would be what Edwards would have gotten if he had participated in the negotiation. In the settlement, correct. Right. And what would the, you know, I asked you for that figure earlier. What would that have been? $11,400 and something dollars is what we told the district court it would have been. The way we got there, Judge Roth, was we totaled up these value of benefits that I mentioned earlier, the total benefits that Wyatt, just Wyatt, received under the settlement agreement with Phillips, $32 odd million. We deducted from that the $5.2 million that went to Mr. Edwards' bankruptcy estate, and then we applied the pro rata formula to the rest. Mr. Edwards, under the pro rata formula, gets 45% of the rest. It's about $11.4 million. And there's two ways to look at this. The deal would have been $11.4 million if Edwards had participated in the negotiation. Right. Wyatt would have shared $11.4 million of his total benefits of $32 with Edwards. Wyatt would have kept the rest. That would have been the deal. And there's two ways to look at this from a settlement dynamic perspective. How do you value whether he would have been put in the settlement? One is very complicated. You have Phillips and Wyatt negotiating, and if Edwards gets injected in, does it lead to a settlement? Does Phillips change his position because Edwards comes in? How does that three-way dynamic occur, leverage, negotiation? We didn't go that way. Too complicated. We can't be sure. Oh, yes, we can be sure. Because the district court says in her conclusions of law what she's valuing, what she's awarding Edwards' damages is not some big pie. It's what did Wyatt receive, millions of dollars of economic benefits, I think is her phrase, more than Edwards received. No, what I would suggest that we can't be sure about is if Wyatt hadn't cut Edwards out of the deal, we can't be sure how the three of them would have negotiated. That seems to me to be speculation. What's not speculative is the deal that Wyatt cut for himself. And it seems to me that the trial judge said, well, the most concrete thing I have to go on here is what actually happened. That's exactly right, and that's exactly why we did it the way we did it. We didn't try the three-way analysis. Too complicated. Speculation. We said, at the very least, Wes Wyatt, as a result of his breach, got a bundle of $32 million worth of benefits. And at the very least, if Wes Wyatt had honored the handshake agreement, he could have shared some of those with John Edwards. So you're saying it should be restitution damages rather than expectation damages? Well, our position below was it should be expectation damages because the pro rata formula should apply. And how do you get to the pro rata formula? It's not in the brief oral handshake agreement, but it's the whole foundation for these men's relationship. They're not friends. Their only relationship in the world is they both want to get control of their pilot stock. John Edwards, 33 and a third. Wes Wyatt, 45 under a cloud. They want to move forward. They want to profit. Is it possible that the categorical distinctions between expectation and restitutionary damages might not be what we should focus on here because of the complexity? I think that's a very good point. I think it may be that if you don't accept the pro rata formula and you're searching for a different damages theory, it may take a whole new question. Well, I guess what I was suggesting is query whether if the pro rata formula is determined to make sense, and I'm not saying that it will be, but if it's determined to be sensible and the best alternative on the unusual facts of this case, does it matter whether we call it restitutionary or expectancy damages? No, it certainly doesn't matter what you call it. What matters at the end of the day … Well, restitution, at least historically, is an equitable remedy, is it not? Well, pure restitution is an equitable remedy, but certainly under ATAX, the Third Circuit charted out three theories of contract damages, expectation, reliance, and restitution. No order of preference indicated among them. If I could, I see my time is up. I'd just like to … That's all right. So let's assume we call it restitution. If it is inherently equitable in nature, why not use a pro rata formula for determination of a restitutionary calculation? Absolutely. What's wrong with that? Nothing's wrong with that. Except Judge Tucker didn't really make any findings about the 45% that Mr. Wyatt claimed he already had in pilot. She did not address that directly, as we previously talked about, Your Honor. Although, as Your Honor said in questioning Mr. Zucker, when you look at what she did, it does look like she's trying to take away the benefits that the breacher got from the breach and share some of them. The basis for the pro rata formula is all over the record, but just one site quickly. Joint Appendix 421, West Wyatt's testimony. In early 1988, I approached Edwards about aligning, quote, to try to protect my 45% interest and to try to help Edwards protect his 33 and a third interest. It's the only relationship between these men. It's the only reasonable formula that one could apply if one does look for a formula under expectation damages. I see that my time is up. I'd be happy to answer any other questions or let you all have a good rest of the day. That assumes that even if we have no further questions, we'll have a good rest of the day. Judge Roth? Thank you very much. We'll have Mr. Zucker back on rebuttal. Judge Roth, I can answer your question, at least, on Judge Tucker and the finding regarding the ownership of the stock. And that is in her decision on page – it's actually paragraph 7 of the – we submitted a stipulation of undisputed facts before the trial. And paragraph 7 states, page 2 of her decision, in the fall of 1997, Wyatt owned 45% of the issued and outstanding stock of Pilot, comma, et cetera. So if the court was looking for that in the record, that's where it may be found. Okay. Okay. I know that the court was struggling with – you know, it seems like Wyatt did nothing and beat this guy, Edwards, and Edwards is now left out in the cold and he didn't get anything and Wyatt somehow is maneuvering through the Third Circuit law and gets away with all this money and doesn't really give anything for it. But it's not about getting nothing. Clearly, Edwards got something. He didn't get what he was entitled to. I mean, these guys had a deal. Right. And Wyatt walked the deal. Yeah. For his own pecuniary benefit. Correct. Yeah, he did. I mean, it's not disputed. Putting aside, again, the other arguments made, that there's an agreement and there's a breach. But damages have to fit into what the circuit says damages have to fit into, respectfully. And the cases say that you have to measure damages at the time of the breach and that reasonable certainty embraces a rough calculation that is not too speculative, vague, or contingent on some unknown factor. Business people need to know what could happen if I breach this contract. You know, this is, like Your Honor mentioned, 1L. In law school, my contracts teacher told me that's important because you might have a requirements contract where you have to buy all your oil this season from a certain supplier. So you know what you owe to that guy. And now another supplier comes along and makes a better deal, so it may pay you to breach that contract and go with supplier B, and at least you'd know what you're, yeah. You're reading my mind. Okay. But it seems to me that undermines your position because what happened here was not that Wyatt, after breaching the handshake agreement, went forth and negotiated with some unknown party and concocted a deal that inured to his benefit through his own diligence and wisdom. Rather, what he did was he went ahead and cut a deal precisely with the person that the handshake agreement prevented him from bargaining with. And doesn't that indicate that there was some expectation or fear on the part of the parties to the handshake agreement that cutting one or the other out and doing a deal with Phillips would be unfair? What's unforeseeable about that, I guess, inartfully asked of you? I think what throws a monkey wrench into that situation is the bankruptcy and the benefits you get as a Chapter 7 debtor in a bankruptcy. He got to save his house. All right. But now I think you've got to, at least speaking only for myself, you've got to persuade me why that bankruptcy order had some sort of res judicata effect upon the breach and damages flowing from the handshake agreement. Because this whole case is about the pilot stock. Nothing about this case isn't about the pilot stock. All we talk about here is pilot. All we've talked about since 1999 is pilot. The bankruptcy was about pilot. It was about nothing else. It totally related to pilot. But opposing counsel said the handshake agreement and its breach and damages were not at issue before the bankruptcy court. Is that wrong? Well, that's his opinion. I think it's wrong. No, no, no. Well, what's your opinion and tell us why it's wrong. My opinion is that it absolutely was before the bankruptcy court. Where? Show us what the bankruptcy court, what findings or something before the bankruptcy court to prove that. I can prove it by it's like a show us where it isn't. Because it was never when Wyatt and Phillips walked in on the morning of October 30th and said we've reached a deal, 5.2 million, and these gentlemen jumped up and said it's a collusive bid. It's illegal. You can't do that. You have to keep bidding. They were instructed to file a motion, a brief, setting forth all their objections to this so-called collusive bid, and they did. But they didn't bring up the handshake agreement. They never brought it up. They kept it in their back pocket for whatever reason. I don't know. That's not for me to figure out or speculate or guess why. I don't know why they did that. The bankruptcy judge, because of the objection to the deal, did she look at the fairness of the price that was being offered? Yes. There was testimony by Stephen Scherff, who was the trustee's expert on valuation as to the value of the stock and the real estate. So, yes, she did look at that under the Abbott's Dairy Standard and so forth, and her decision came out December, mid-December 1998. I can't remember, but it's a reported decision, and the site is in our brief. And she found specifically that the bid for the assets of the bankruptcy estate was a fair bid? Absolutely, and Mr. Wyatt received a release from the bankruptcy estate. Then along comes, you know, a year later, Mr. Edwards and Susan, and now, nine, eight years later, he gets a judgment for $6 million. I mean, a 363 sale is supposed to be, you know, as a business person, as a business lawyer, you know, the 363 asset is the cleanest asset you can get. That's by the bankruptcy court. And all of a sudden, we have this lawsuit. It's just not fair, you know. All right. Thank you. Interesting case. It is an interesting case. Thank you, Mr. Zucker. You're welcome. Thank you, counsel. I can't say that I've ever seen a case even close to it, alone quite like it. There's been reference here by Judge Roth and one of counsel to 1L contracts courses. It strikes me more as a problem from second year, my second year remedies course, but whatever, we've got to figure out what to do with it. May I add that it strikes me it might be germane to my third year mediation class. I wish that had occurred. Would it be indelicate to suggest that the parties are free to continue negotiating pending our resolution of the case? We actually have. Yeah. All right. Thank you very much. We'll take the matter under advisement. We'll ask the clerk to close the proceeding. Thank you.